This is case number 4150396 in re Marriage of Marcy Stegman and Ryan Stegman. Did I pronounce that correctly? Yes, sir. Thank you. And for the appellant, we have Mr. Scott for the affiliate, Jennifer Asher. And also appearing is the child representative, Dawn Bingham. But as I understand it, Dawn will not be arguing. Is that correct? We don't know. Are you requesting argument? The court thinks it's probably not necessary that something would come up where we felt like we needed to ask a question and proceed in that fashion. But as of right now, we do not anticipate an argument. Mr. Scott. Your Honor, my client's name is Jameson at the present time. That's due to her remarriage to Travis Jameson. Okay, thank you. Your Honor, I'm here on behalf of Marcy Jameson with regard to primarily the issue of custody of her four children. The children are, we refer to them as initials, but we call them Jake and Claire and Will and Lila. Jake is now 15. He was 13-14. Claire is 12. She was 10-11. Will is 10 and I think he was primarily 9. Actually, Claire will turn 12 in a month. And Lila is now 9. She was 7-8 during these proceedings. We believe that the court erred in denying the petition for modification for a number of reasons, and I've laid out most of those in our brief. But I want to talk with you about certain areas that I believe that the court did not consider and that the evidence was not properly adhered to or considered by the court, because we believe the manifest way of the evidence shows that the court should have granted the change of custody. Also, that the court abused its discretion in not changing that. One of the primary purposes, or one of the big areas that the court did not pay enough attention to is the preference of these children, and specifically the older child. We've given the court some authority with regard to strong preferences of a mature child and how the court should pay close attention to that when they're making this decision. And we understand it's a hard decision. We also understand the decision is one to say there is a change in circumstances and then also to look at the necessity of changing custody if the first hurdle has been overcome. And in this case, this child, who was the most mature child, has been giving a preference to a number of people, not just to one person or to his mom or to maybe his family members. He has been telling his psychologist for over four years. And his preference has been growing stronger and stronger, as has his maturity. In fact, his psychologist told the court in his testimony that he was mature enough to make this statement to the court. He was mature enough to understand its consequences. And that it was his independent action, not something that someone else was influencing him to do. Not only did he make that preference known to himself, to his mom, to his stepmom, to people that were, I guess, acquaintances of the family, to his aunts, his uncles. This is something that he would tell everyone. Not only did he do that, but his sister Claire did that. She told the psychologist on two occasions that he had occasions to meet with her, that that was her preference. She told her grandparents, with whom she visited for a number of years in their home, consistently that that's what she would like to do. In fact, she even went with her grandma shortly before the hearings, one of the last hearings, and lit a candle asking God to please let her go live with her mom. The little guys, Will and Lila, also made those preferences. And we believe that the court did not give proper weight to all of that. Mr. Scott, if I might interrupt you just for a moment, in terms of changed circumstances, the preferences of the children that you've just been highlighting, have those been consistent? In other words, have they consistently held those preferences and voiced those preferences? Or has that changed, and has that constituted a changed circumstance in your argument? Well, I think it does constitute a change in circumstances because they have grown stronger, and they have been consistent in J.S. or Jake from April of 11, which was our date that the court was to consider forward based upon the rulings of the court. But it has also grown stronger, and that, in combination with the other changes in circumstances, we believe are sufficient for the court to find that there was a change in circumstances for these children. And those other changed circumstances being? The other changed circumstances are a number of them. First of all, Mr. Stegman or Ryan, as we refer to him in our brief, has created an environment of exclusion or hostility towards the mother. Since the time of the last ruling of April of 11, which was our time forward based upon the court's ruling, and there are several areas that this has been shown in the evidence. First of all, at events, public events, we gave the court at least five instances of where he has acted inappropriately towards the mother. One of them was where the little girl, Lila, came over, and this was in May of 13. The little girl, Lila, came over, sat on her lap for 30 seconds. He texts her. She has to come back. She can't stay there. And then during the entire time of the game, the little girl gets to play with all the little kids around, but doesn't get to see the mom. In March of 2013, at a basketball game, and this is the one where my client took a picture of her little girl trying to wait. They come over for a few minutes. You have to come back. In fall of 2011, there was a big incident at a football game. He comes over and he starts accusing my client of being a drunk driver, that you're a terrible mother, that nobody likes you, all in front of the kids. This isn't lost on the children. And this, we gave the court five examples of those. I think I've covered most of them, but I wrote them down. May of 2012, you're sitting too close to me. If you don't move, I'm going to call the police. One time at the end of a game, which was in May, he comes over and says, you're sitting too close to me. She says, there's a minute left in the game. There's nowhere else to sit. I'll move as soon as I can. He says, if you don't leave, I'm going to call the police. Did he ever call the police? Did he ever call the police? He did on one occasion, but that was in July of 2012. And in July of 2012, if you recall, that's the incident where he accused her of being intoxicated when she came to the child's game. And this happened about two weeks after she had filed for a petition for change of custody. He called the police on her, alleging she was intoxicated at the child's baseball game. And the evidence shows, not only was she not intoxicated, but that the officer who actually talked to her, which was Officer Crowley, he who talked to her clearly said she was not intoxicated. Neither officer said she showed any signs of intoxication. And he called the police on her directly contrary to what Dr. Hetherton said should have occurred. He said, you don't call the police on her unless there's some serious situation. So he did that right after a petition for change in custody took place. That's the only time he called the police on her. The other area that he has sought to exclude the mother from is the area of schooling, tutoring, education. She was not even listed, even though in April of 2011 he was directed to list her as a parent at the school. No, he didn't do that. When she goes in October of 2011 to go to a parent-teacher conference, she has to bring a court order so that she can even have a parent-teacher conference. Because she'd never been listed as a parent. He didn't tell her who the teachers were. She had to find out all of that. Then they have a Skyward program, which if the court's not familiar with what that is, is an internet program where it allows a parent to contact school, get school information, interact with teachers. And that was a program that was established at the Chatham schools. My client had never been informed about it, was never listed as a parent about it. And then what happened was in July of 2012, after a petition had been filed, suddenly she's added to the Skyward program. Again, something that only occurs after a petition is filed. And when she's added to the Skyward program, there's an alert. Do not release these children to the mother. He claims he didn't know how that got on there. Counselor, what are we to make of your client's unfounded reports to DCFS? Well, Judge, that's something that I was going to bring up, but Justice, I apologize. There were two times that she contacted DCFS. She's been alleged to have contacted them four times. The first time that she contacted DCFS was in July of 2011. That was the incident where the child told her that Megan, Ryan's wife now, girlfriend then, choked her. And if you look at our Exhibit 54, you'll see the marks on the child's neck. This occurred while it was discovered at the grandparents' home in Petersburg. And what she did is they contacted a teacher and said, should we contact the department? They said, yes, go ahead and do that. So she did. That was initially founded. There was an ALJ hearing, or an administrative hearing, I apologize. The ALJ said there's not enough to found it and reverse it. It was initially founded. All of that evidence was available and all those people testified about it before Judge Trumper. And as far as the second time she contacted DCFS, that involved an incident where there was a trip to Arkansas. The little boy got in an argument with his dad and his stepmom, I guess, in the trip back. The father in his brief says, I never hit him. But yet if you look at our reply brief, Dr. Heatherton testified that he admitted to throwing a hat and hitting him in the head. My client saw a mark on the child's face. She listened to a police officer who said, you should contact the department. Contacted the department. They did an investigation. They said it wasn't sufficient. The other two times that he was involved with DCFS was one in which he was videotaping the children. The children were complaining about that. In fact, they complained about it to Dr. Heatherton. That note got to the school. The school person saw it and said, you shouldn't be taking these children's clothes off and videotaping them before they go and when they come back. And that was turned in. My client didn't do that. And everybody acknowledges that the school did that, but somehow she's getting the credit for it. The other time that DCFS, that they claimed my client was associated with DCFS, was they claimed there was a claim against the grandmother. Well, when the videotaping incident came up, somebody had to watch the kids while they were investigating. My client objected to it being the grandmother because there was some conduct where she was allowing herself to be seen naked by Jake. And my client said, hey, pick somebody else to be the supervisor. I don't think that's appropriate. And this court should, as the trial court should, a parent shouldn't have to be told that you don't videotape kids before and after visitation, semi-clothed or whatever. You shouldn't have to say that. In addition to, and I don't want to get off DCFS, but I wanted to go back to the school issue. My client was very concerned about her son's grades, especially J.S., who has ADHD. Two things about that. Ryan did not give the child his medication after July of 11. And specifically in the medical testimony from Terry Stevens, the medical record said in July of 11, if he starts showing signs, which are homework problems, attention problems, concentration problems, then you bring him back, you reevaluate him, you put him back on the medicine if need be. Never brought back. Counsel, let me ask you this. All the things that you're mentioning, they're not necessarily agreed facts. They're contested. And so the trial court, of course, has to judge credibility. I mean, for example, with the grades, there's evidence that the child allegedly told the counselor, I'm letting my grades slip on purpose so that my dad will look bad when we go back to court. So are you suggesting that we step in the trial court shoes and judge credibility? Well, I'm not just, I don't want to dodge the question. If you tell me I am, I'll keep talking. But what I'm saying is it's not just credibility. It is actual facts. The facts on the medication are facts. The child made that statement back in 2012 about I will tank my grades so that way it will look better for the case against my dad. But the case with the child's records at school were that he was having difficulty getting homework in. He was having difficulty with the D's and the F's. He would bring them up. They allowed them a system where they can kind of make up their work. And that's a factual statement as to what is actually occurring with the child. He needed assistance. And the dad got a tutor. Dad got a tutor in February of 2014 after we filed the petition. Dad put him on medication after we filed the petition. Dad said, hey, I only put him back on the medication because you filed the petition. A parent shouldn't have to be told that. And that's what we're saying. And those are facts that we think the court should have paid more attention to. The fact that he would exclude my client from information. He didn't tell her about Girl Scouts initially. Didn't tell her about a baseball team initially. Didn't tell her about the second child, Claire's, first communion until three days before. Didn't tell him about Will's first communion meeting and J.S.'s confirmation meeting until after the first meeting that was mandatory for parents to attend. These are things he didn't tell her about Claire's play. Didn't tell her about gymnastics. This isn't lost on these kids. I think it forms the basis for their preference. And it forms an environment that he is creating. And it's one that I think the court didn't pay enough attention to. And that's what we're asking the court to do is when you review all of this, to take that into consideration. One of the other things that is, I think, not appreciated by the court and not really, I guess, didn't pay enough attention to by the trial court, is his attitude towards my client's extra time with the children. Everything changes when a petition is filed. It's kind of like we clean up our act because now we're going to court. Prior to that, he resisted any extension of time in the temporary custody hearing. There's evidence, and we've documented it in the record. She says, hey, what about President's Day? I'm off. Kids come over. He's, you know, working. No, you can't. It's not in the order. Hey, my brother's coming in from out of town. Can the kids come over? Nope. Hey, the kids are at a party. Can you extend it 15 minutes so that way they can see the magician? Nope. Hey, somebody at work is having a birthday party. Do you care if the kids go? You can even come. Bring your family. Nope. Can't do it. He acts in the company of the children hostile to the mother and erratic. At one kid's, it was Claire's first communion. In fact, the church says the family should sit near the child before she goes up for the communion. When the cleric had her communion, that's fine. Two weeks later at school function, you can't sit next to me. They get up and move because there's a school function. They don't want her around. When the second child has their first communion, no, they won't sit with me. This is not lost on children. This is why the children gravitate towards an environment that is not hostile. And my client's environment has improved immensely. And I agree that the court's first initial thing is there is a change in the kid's situation or in the custodial parent's situation. But when getting over that, looking at the two situations, is my client's home is a stable environment where the children are healthy and happy and where they don't have conflicts. And one of the problems that is in Mr. Stegman's home... You have to do the red light. I've got five minutes. One of the problems in that home is the violence factor and the increasing conflict between Jake and his dad. This last one that happened in October, it seemed to say that my client orchestrated that. How can you orchestrate a child having a twisted arm and bruises? How can you orchestrate that? Where you say, oh, here's my opportunity. She took him to the doctor because that's what the court order said. The doctor said there's enough to turn him into DCFS. It wasn't her. She said, don't take him to DCFS. Tell me what's wrong. Is he okay? What needs to happen? So I think that's a difference. There are a couple of other areas I should mention. One is child support. I think I laid out why I don't believe that my client had due process in the child support issue. It was never noticed up for hearing. It was never referenced by the court in its initial hearing. It was never listed as an issue by Mr. Stegman in his pre-trial memo. And the court increased support. It's different than dealing with support when you change custody. It's also different than dealing with my client's payment of support. Was there still a petition for increase pending, though, at the time? It was filed in 2012, never noticed up. Right, so it was still pending technically. It was pending, but it's never been noticed up. There's also no evidence that there was an increase or a difference between what she was making as a waitress and what she was making as a LPN. Now, we don't have a transcript of those proceedings, correct? No, we do. Of the proceedings for the child support? Yes. That's in the appellate record? There is no hearing. That was the argument. We didn't have a hearing on that. Well, I thought there was evidence presented. No, there was not evidence presented. There was evidence presented as to whether or not my client could work for five minutes in October of 2014. Is there a transcript of that? There's no transcript of that. Unfortunately, there was no report. But that was at a conference or an argument on a motion, and the judge said, come on up and ask her some questions about why she couldn't put her child in daycare because of her daughter's particular condition, and that was it. And our motion said, hey, we are entitled to a hearing. Thank you, counsel. You will have rebuttal. Please proceed. Thank you. May it please the court, counsel. Ms. Asher? Yes. So that I'm not interrupting you during your argument regarding custody, just on that last point that Mr. Scott was addressing, that being the child support issue. Yes. Could you just clarify in terms of the procedure utilized, was there evidence presented, and is there a transcript in the record of the hearing where evidence was presented? Thank you. I'm glad you asked that question. I was going to clear that up to get that off my plate as well. Judge, Mr. Scott is correct. The motion to increase child support was filed in June of 2012. The issue was specifically reserved in the August 31, 2012 hearing. In terms of notice of hearings, when we went to trial for the first time on April 28, 2014, Mr. Scott didn't file a notice of hearing as to his motion to modify custody. We just filed pre-trial memorandums, and the briefs are pretty clear as to what my pre-trial memorandum spoke to. So my answer to your question is that the financial evidence was presented through our nine days of trial. Tax returns were presented. Bank account records were presented. The party's employment history were all presented in trial. And when Judge Trumper's ruling came out in September of 2014, it indicated that Mr. Scott and I were to provide LPN salaries so that the court could set child support at 32% of Ms. Jamison's net income. And at that time, Marcy then filed a motion that her due process rights were violated. Subsequent to that filing, the court's position was, we are all on notice, we all knew we were here for child support. This was part and parcel of the whole nine days of trial. We were hearing that issue as well. But if you feel as though you haven't had a hearing, let's have a hearing right now on October 25, 2014. There is no transcript as to that hearing. I disagree with the assertion that it was only five minutes long. There was no motion to continue by Mr. Scott. There was no motion to leave proofs open. There was no indication that he wasn't prepared to go at that time. Judge Trumper said, if you want to testify and present evidence, we can do it now. Everyone agreed. And Marcy did get up and testify as to her position as to why she could not work. And that hearing is referenced in Judge Trumper's order, but there is no transcript that addresses that specifically. But as to the financial position of the parties, our position is that was all contained within the nine days of trial on the hearing on all issues that were pending at the time, as set forth in my final pre-trial memorandum. Ryan has played defense this entire time. He was awarded custody of the four children when they were 9, 6, 4, and 3 in September of 2009. Since that time, he truly has played defense in a war waged from our position against Marcy. Marcy agreed on April 4, 2011, to custody being placed with Ryan. And the record is clear that, and I bring this up because we talk a lot about preference, the record is clear that the children up until the time that Jacob testified, in December of 2014 and January of 2015, had no idea that their mom ever agreed to their custody being placed with Ryan. Clear that Jacob had no idea. And then after she agrees in April of 2011 to custody being placed with Ryan, she again agrees and withdraws her motion in August of 2012. And she agrees again at that time. Despite all of the wrongs that she thinks are happening, she agrees again, August 31, 2012, that custody is properly placed and to remain with Ryan. When we look at preference, case law is clear that we have to look at, is preference based on the best interest of the child? You can't just say, hey kid, where do you want to live? And put the kid where they want to live. You have to look at, is that preference based on good factors? And here, the trial court, after many, many days of trial, found it is not in Jacob's best interest. But the suggestion that the trial court didn't hear Jake's preference or didn't hear Claire's preference is misguided. Because Marcy has gone from two court orders where she agreed to two out of 14 nights, every other weekend from Friday at 6 to Sunday at 6, to now she has five out of 14 overnights with three younger children. And seven out of 14 overnights with Jacob. So the suggestion that the court didn't hear that Jacob wanted more time with his mom is misguided. That coupled with Jacob's mind made up. In the reply brief, Marcy states that Dr. Heatherton never said Jacob had his mind made up. If you go back to volume 25, you'll see Dr. Heatherton said, yes, Jacob suffers from mind made up. He, since 2009, has viewed his mother as flawless. She has no flaws. He's championed for the wrongs that were done to her. And Marcy testified, the kids knew I drank. The kids knew I messed up. But she herself testified, they did not know I agreed to their custody being placed with Ryan. So the court having that knowledge looked at that fact when considering that custody was properly placed with Ryan. The court also had the strong testimony of Dr. Heatherton that indicated its concern with Jacob and Ryan's relationship if custody was placed solely with Marcy. Dr. Heatherton had grave concerns that Jacob wouldn't want to continue to have a relationship with Ryan. And the court found that not to be in Jacob's best interest. And that concern is bolstered by Jacob's testimony that he didn't want to see his dad. So we have this hearing through spring of 2014. We have this child support issue that arises. We have a hearing in October. And then less than a month after the court issues its ruling in September of 2014, we have new motions alleging abuse, new verified petition for order of protection. We need more hearings. The court clearly hadn't heard enough. Marcy wants the court to hear more about this alleged event that occurred in October 2014 at Ryan's house. And that's after that is when Jacob testified. And at that time, Jacob and Marcy both testified that they were aware of Judge Trumper's ruling and Jacob was certain that his mother would never have agreed to him living with Ryan. And that goes all the way back to December of 2011. Marcy agrees in April of 2011 to custody be in place with Ryan. Yet months later, she text messaged Jacob, I'm doing everything I can, I promise I'll get you guys back. And that's been the mindset when it comes to preference for these children going forward. Mr. Scott indicated that everyone, they tell everyone that they want to live with their mom. That's accurate. Not one teacher testified that Jacob or Claire had ever told them that they wanted to live with Marcy versus Ryan. Not one neighbor came forward and testified that the children told them that they wanted to live with their mom and not their dad. So with respect to who Claire and Jacob are giving their preference to, I think this court should take that into a large account because it's not, it is Marcy and her family members. And again, Marcy is the person in their eyes who has been wronged, despite the court having increased substantially her custodial time. The other issues I wanted to address with respect to school, the school is easy. Ryan registered the children at Chatham with a paper application. Marcy wasn't there. Of course, she presents to this court that he didn't list her as a parent.  She's always been listed as a parent. In fact, the August of 2012 order specifically says Marcy's in charge of her own self, and she's in charge of getting on Skyward and signing herself up. Why that would be Ryan's responsibility baffles me. I'm not sure why they point the finger at him with respect to that, but he's always kept her apprised. If you look at pages 56 through 58 of our brief, numerous, numerous emails where Ryan's emailing, at first he would email Marcy's dad because he believed that was the person he was supposed to be in communication with, but subsequent to that, Marcy. Will has this baseball game. Jake has that football game. This event's coming up. That event's coming up. And the email communication back from Marcy is, don't use this Gmail account. Use this Yahoo account. Don't use that Yahoo account. Now I'm using this Gmail account, making it very difficult at all times for Ryan to communicate with her. Another example of these burdens and hurdles that Ryan is constantly forced to jump over for Marcy is this extra time. Parents aren't required to give extra time. Certainly we all hope that everyone lives in a world where if you have a family birthday party on Mom's side, and the kids are with Dad, you can work together and go to Mom's side. But Ryan's allowed to make plans and allowed to have events scheduled during his custodial time, and the fact that he did that is no reason to point any finger with him. On the flip side, there were times that Ryan was dropping off the kids early. Two specific times. And Marcy hauls her neighbors in to testify that she wasn't home, she didn't know the kids were coming early, and wants to point Ryan in a bad light for bringing the kids early. So anything Ryan ever does always is used against him, and that's truly how he's had, unfortunately, to parent these kids since oh-nine. Videotape is another prime example. Custody disagreed to, these allegations of bruises, and I'm certain this court has looked at that exhibit. Those are childhood bruises that happen every day. There's nothing abnormal or major about the bruises on Lila's neck. The ALJ's opinion is very clear that they could have easily come from a bicycle strap from her helmet, or from, we also had introduced pictures of Lila doing gymnastics around that time, where she could have hit the bar. Nothing atypical about those bruises on Lila's neck. But Ryan's now in a position where his girlfriend Megan had been out of the home for 90 days because of the initial finding of abuse. And so he is absolutely worried about any scratch, any bruise that arises on these kids, because he is terrified as to who will be contacted, what will happen next. So when DCFS suggested to him that he videotape them with their clothes on, there was never any videotaping with their clothes off, but with their clothes on, he did so. And, of course, that led to a notebook being given to Jacob at Mom's house, and following a visitation at Mom's house, that notebook getting to school and DCFS being called again. And so Dr. Heatherton did tell Ryan, look, probably not a good idea to videotape them, don't do it, he stopped. Ryan does what he's told to do by Dr. Heatherton, Ryan does what he's told to do by the court, and yet somehow he's always at fault for not doing it right. Another prime example is these extracurricular activities. Again, there is a court order that says, whosever custodial time it is, the kids sit with that parent during their custodial time at extracurricular events. And somehow now Ryan's at fault for following and asking Marcy to follow that court order. It's baffling to me how he can literally do nothing right when it comes to parenting these kids. On the plus side, every single teacher that testified, Ryan's neighbors that testified, and quite frankly, all of Marcy's witnesses, the underlying theme is the Stegman children are happy, they're well-adjusted, they're clean, they're polite, they're nice kids. So despite all of this, we do have four, as Judge Tomper points out, talented, beautiful, very well-adjusted children. And the law is written such that that stability should not be taken from these kids. Their preferences have been heard. And Marcy's circumstances have certainly changed. She's remarried. She now lives in a nice home in a nice affluent neighborhood. She now has two children that have come after the birth of these four children. She certainly has made life changes. And again, whether or not there were agreements prior to the temporary hearing as to increase custodial time, the court will never know that because those are settlement negotiations. So an assertion that we never agreed to additional custodial time isn't fair because that's not part of this record because it's excluded as a settlement negotiation. So it asks that this court disregard that statement. We did get to a point where we had to have a temporary hearing because we couldn't reach an agreement as to custodial periods. And the court, after hearing just from Marcy, the record's clear that my client never got an opportunity to testify in late 2013, gave Marcy additional time alternating Wednesdays after school until, I think, 5.30. So from 09 until November of 13, she had alternating weekend visitation. In November of 13, we added in an alternating Wednesday. And then in September of 14, when Judge Trumper made her ruling, we went to 5 out of 14 for the three younger children and 7 out of 14 for Jacob. So our contention is the court did hear the children and that their preferences were taken into consideration. I think that the amount of time Marcy has spent with these children also, in some respects, speaks to their preference. From 09 until, essentially, September 14, she got to be the fun parent. She got to have them on the weekends. And she testified a lot to chores and different routines and different things that she had at her home. But we all know that's not required on the weekends. Ryan, from 09 until now and continues to do so, has been the parent that gets the kids up every day for school, has been the parent that makes sure that their lunches are ready, has been the parent that makes sure that the girl's hair is done, that the girls are dressed, has been the parent to sign them up for extracurriculars. And in terms of signing them up for extracurriculars, Girl Scouts is, again, just another prime example. Ryan talks in passing to the Girl Scout leader and says, Hey, yeah, Claire might be interested. Mentions this to her. Doesn't sign her up. Gets the pamphlet. Moves on. Next thing you know, there's an allegation that Ryan has signed her up and hasn't consulted with Marcy. Again, he has sole custody. Quite frankly, he can sign these kids up for whatever he wants. He didn't do so. He talked to the Girl Scout leader, and when he signed her up, he let Marcy know, he listed Marcy as parent. So it's all perception, and it's how these little incidents are packaged to this court. And a review of the record reveals that Ryan truly is doing everything he can to follow the court order to include Marcy in their lives. He went on a honeymoon after getting married in October of 2013, and I'm certain that Mr. Scott will claim, Well, that's after we filed our petition. Quite frankly, he doesn't really, if he has custodial time, he enjoys being with these kids. His neighbors testify that all the time he's out with the kids. He's at the local YMCA in the west side in the pool. One neighbor testified that she sees him there. All four kids climbing on him, hanging on him, playing in the pool together. He doesn't have a lot of need for extra alternative care for these kids. But when he did, because he was going on a honeymoon, who did he call? He called Marcy. Another incident, again, that we just have to defend constantly, is there was a water ski tournament on Lake Petersburg. Ryan made sure Jacob could get there so he could watch that with his grandparents. He's allowed to make plans during his time. To the extent possible, he's given Marcy additional time. Soups and hoops is another one. They made a big deal about the children not being able to go to soups and hoops when the children's aunt testified. She hadn't had it in the last year and maybe even two years. So anything negative that Ryan's done has been presented to the trial court. The trial court has found that it did not meet the burden of substantial change in circumstances, and that's because there's not been, by clear and convincing evidence, that anything with respect to these children's lives or to Ryan's life has changed. With respect to their preference, Justice Harris, you asked if it's grown stronger, and Mr. Scott said yes. Quite frankly, that record doesn't reflect that. Jacob's preference to live with his dad is like a roller coaster. If you carefully review Dr. Hetherton's notes, you'll see that after a custody order enters, Jacob settles. He calms down. He gets into the rhythm. He's good. And then he knew April 13th. Dr. Hetherton didn't know how, but Jacob knew that was the date. That was the date his mom could go back to try to fight for him again. And yes, he agitates. He attempts for his grades to get lower. So Jacob is very, very keen and astute to what's going on, and he's taken in his emotions and his preferences. I would suggest to this Court, follow the roller coaster of what has been the lives of these parties. He's over 15 years old now. Just now 15. Just turned 15. With respect to ADHD, Dr. Steele, she's not a doctor, she's a nurse practitioner who's able to prescribe the medication. No concern with lack of treatment of Jacob's ADHD medication by Ryan. She said she absolutely had no concerns as to how Ryan is administering the medicine and no concerns that Jacob wasn't getting it regularly. And does Jacob need it when court proceedings are going on? Yeah, he probably does because it is a very difficult time for him. These children have been misled as to the role of the child representative. These children have been attempted to be subpoenaed at home. They have been taken to Howard Feldman's office by their non-facilio parent without direction of the court. They've basically been given license to do what they want at Ryan's house and to keep journals and lists of everything bad Ryan and Megan do. And that all comes up at the time of trial. But when we're not in court and there's not a battle going on, these are happy, well-adjusted kids whose stability and adjustment to their current home, where they've lived since 2011, where they've lived with Ryan and Megan, where Ryan's maintained a job where he supports these children up until September 14 with $300 a month. He supports them completely, and he's done so very well. And as Judge Trumper does, he should be commended for how he has portrayed their mother to them. Thank you. Thank you. Mr. Scott, any rebuttal? Yes, sir. A couple of things that I'd like to point out. First, with regard to Dr. Heatherton, and we brought this up in our brief, Mr. Stegman didn't even know why this child has been going to counseling for four years. He didn't even know that this was because of problems in his relationship with the child and problems in the child's relationship with his wife. These are not problems that are created by my client. These are problems in that home. And the person who is the custodial parent doesn't even realize why the child is going to counseling. With regard to Dr. Heatherton, he never diagnosed the child as mind made up. He says he thinks he may have that syndrome, but he never diagnosed that. And in our brief, we refer you to the pages of his testimony where he said that this change in custody may actually help his relationship with his dad, may actually be a benefit. There's also a statement that he makes that I think is important, and it also ties into, if you remember the Wyckoff case, I think I remember it because I was young back then, but at any rate, in the Wyckoff case, one of the things that the court said, sometimes kids just know. Because they live in the environment that you and I are looking at from all different sides and professionals are looking at, but sometimes kids just know. And one of the things that Dr. Heatherton said is, hey, this guy's feelings and this guy's strong feelings can be because of his experiences. It just might be because of what he knows. So we can ignore it. That's the approach. In fact, that's a problem that I think is in the court's last statement. Hey, don't come back here. Hey, there's no help for you here. And to this child, it's okay, you're 15, gut it out for three more years. What's going to happen then? We've ignored you. Your relationship isn't good with your parent. You're going to counseling, which isn't helping. And it's not just rollercoaster. His preferences haven't changed. They've gotten stronger. And it's not like there are times that he gets along better with his dad. Then an event happens. He's called a liar by his dad. He really is upset about that. And the testimony is clear from Dr. Heatherton that he's upset about that. But his dad doesn't bother to understand that calling him a liar affects his relationship. He's called him a liar on at least three occasions. How about the doctor's concern that if your client is given custody, that there would be a permanent end of relationship between father and son? There's no evidence to that effect. There has not been any evidence that my client would engage in those activities. There evidence is to the contrary that she contacts him. She tries to interact with him. She's not trying to keep these kids from him. That's not what's going on. I point out one thing. I know I'm near the end of my time. I'm almost done. But one of the things that counsel mentioned is that my client agreed to the custody. In April of 2011, that was in the court order. And she testified that was at the recommendation of her attorney because it gave her from restricted visitation to having weekend visitation and telephone contact. And then in August of 2012, her attorney advised her that she couldn't meet the serious endangerment statute. But part of that agreement was if, in fact, this is ever reviewed, it goes back to April of 2011, and it goes back to a best interest standard, which is obvious in both parties testified that they understood that probably this issue would come back. So I don't think as if you can say she agreed, and therefore that's the end of the story. With regard to not teachers and neighbors not talking about preferences, none of the teachers talked about preferences being expressed by the children. None of the neighbors talked about expressions of preference. And people a child is going to tell a preference to is somebody they trust, family members, extended members. And actually there were friends of my client that testified. And Hillary Pulliam is one, and Brandon Trolley is another where the children expressed that preference. So it's not something that's inconsistent. Thank you. Thanks to both of you. The case is submitted, and the court stands in recess until further call.